**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 5, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHRIS HOGAN, an individual,

        Plaintiff - Appellant,

v.

MICHAEL K. WINDER, in his
official capacity as Mayor of West
Valley City, Utah, and in his
individual capacity; WEST VALLEY
CITY, UTAH, a municipal
corporation; KEVAN BARNEY; THE
SUMMIT GROUP; DAVID SHAW, in
his individual capacity; KIRTON &
McCONKIE, P.C.; TODD
MARRIOTT, in his individual
capacity; GARY JONES, in his
individual capacity; KANE LOADER,
in his individual capacity; UTAH
TELECOMMUNICATIONS OPEN
INFRASTRUCTURE AGENCY;
DESERET DIGITAL MEDIA, INC.;
SEAN BUCKLEY; QUESTEX
MEDIA GROUP, LLC doing business
as FIERCEMARKETS; DONALD J.
RZESZUT, and DOES 1-100,

        Defendants - Appellees.

No. 12-4167

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:12-CV-00123-TS-BCW)**

Steve S. Christensen (Craig L. Pankratz with him on the briefs) Christensen Corbett & Pankratz, PLLC, Salt Lake City, Utah, for Appellant.

David L. Mortensen, Stoel Rives LLP, Salt Lake City, Utah, for Appellee West Valley City, Utah, and Jeffrey J. Hunt, Parr Brown Gee & Loveless, P.C., Salt Lake City, Utah, for Appellee Deseret Digital Media, Inc. (David C. Reymann and Austin J. Riter, Parr Brown Gee & Loveless, P.C., Salt Lake City, Utah, for Appellee Deseret Digital Media, Inc.; Monica S. Call, Stoel Rives LLP, Salt Lake City, Utah, for Appellee West Valley City, Utah; Erik A. Olson, Olson Law, P.C., Salt Lake City, Utah, for Appellees Kirton & McConkie, P.C. and David Shaw; Michael P. O'Brien and Jesse Oakeson, Jones Waldo Holbrook & McDonough, Salt Lake City, Utah, for Appellees Kevan Barney and The Summit Group; Steven W. Allred, Salt Lake City, Utah, for Appellee Michael K. Winder; Kristin A. VanOrman and Jeremy G. Knight, Strong & Hanni, Salt Lake City, Utah, for Appellees UTOPIA, Todd Marriott, Gary Jones and Kane Loader; Richard A. Van Wagoner and Melinda K. Bowen, Snow, Christensen & Martineau, Salt Lake City, Utah, for Appellees FierceMarkets, also known as Questex Media Group, LLC and Sean Buckley; and J. Simón Cantarero, Pearson Butler Carson & Cook, PLLC, South Jordan, Utah, for Appellee Donald J. Rzeszut, with them on the brief).

———————

Before **TYMKOVICH**, **BRORBY**, and **MURPHY**, Circuit Judges.

———————

**TYMKOVICH**, Circuit Judge.

———————

Chris Hogan lost his job with the Utah Telecommunications Open Infrastructure Agency, or "UTOPIA," a state agency charged with upgrading high-speed internet access. Claiming he was fired for revealing a conflict of interest in contract awards, he threatened to sue the agency for wrongful termination. Shortly after making this threat, he was subject to several unflattering media articles about his job performance and his termination dispute with the agency's leaders. Several of the stories claimed his threats to sue the

agency amounted to extortion or blackmail.  It turns out the first of these stories was written pseudonymously by Michael Winder, who was the mayor of West Valley City, where UTOPIA did much of its business.

Hogan sued UTOPIA, the mayor, the City, and a number of other persons he believes were involved in the publication of the articles.  He claims the articles constitute defamation, false light invasion of privacy, intentional infliction of emotional distress, a deprivation of his constitutional rights in violation of 42 U.S.C. § 1983, and a civil conspiracy under 42 U.S.C. § 1985.  He also sued UTOPIA for First Amendment violations, breach of contract, wrongful termination, and other violations of state law in a separate lawsuit.[1]

The district court dismissed all of the claims, and we AFFIRM.  Largely because the articles' critical statements are explained by their context, we agree with the district court's conclusion that the articles were neither defamatory nor otherwise tortiously offensive.  And we further agree that Hogan's federal law claims cannot go forward because he has insufficiently pleaded that the defendants' actions were exercises of their power under state law and that the defendants conspired to punish Hogan for bringing his claims to court.

---

[1] In *Hogan v. Utah Telecomm. Open Infrastructure Agency*, 2014 WL 1798470 (10th Cir. May 7, 2014) (unpublished), we upheld the district court's dismissal of his First Amendment and several other claims, affirmed summary judgment in his favor on his breach of contract and breach of the covenant of good faith and fair dealing claims, and remanded for further consideration of his wrongful termination claim.

# I. Background

Beginning in 2008, Hogan worked for UTOPIA as a consultant under the terms of a professional services agreement. In the spring of 2011, Hogan began to suspect that UTOPIA's executive director unfairly favored a bid for a contract from the company where the director's brother worked. Hogan expressed his suspicions to UTOPIA's plant manager, who oversaw the contractor selection process. The plant manager discussed Hogan's suspicions with the executive director, who shortly afterwards terminated Hogan's employment.[2]

The day after Hogan's termination, Michael Winder contacted Hogan to request a meeting. Winder is the mayor of West Valley City, where UTOPIA had substantial operations. At his meeting with Winder, Hogan came to suspect that Winder was aligned with UTOPIA because Winder asked Hogan to turn over his UTOPIA cell phone. When Hogan hesitated, Winder indicated that UTOPIA's executive director had asked him to collect it. Later, UTOPIA's executive director sent a text to Hogan's wife's cell phone, a number that Hogan had disclosed only to Winder.

---

[2] Hogan argues that UTOPIA elected not to renew his contract because he reported the executive director's conflict of interest to a UTOPIA employee. UTOPIA, however, claims that Hogan was terminated for reasons only tangentially related to Hogan's attempted whistle blowing. Because Hogan's allegedly wrongful termination is addressed in his other lawsuit against UTOPIA, we do not probe the reasons for Hogan's termination here.

Hogan then hired an attorney, who sent UTOPIA a draft complaint, alleging wrongful discharge and several contract claims, along with a letter indicating that Hogan would be amenable to settling the dispute. Three days later, Hogan's attorney sent another letter suggesting that, since Hogan realized the "public scrutiny" and press coverage that would result if he filed his lawsuit could destroy UTOPIA, he would be willing to resolve the dispute if UTOPIA met four demands: that UTOPIA replace its executive director; that Hogan be allowed to participate in the search for a new executive director; that Hogan be able to "present a success plan for himself so there is a smooth transition"; and that UTOPIA pay him $219,000 in expectation damages, punitive damages, costs, and attorney's fees. App. 308.

UTOPIA's counsel responded to this letter, suggesting that Hogan's proposed course of action, "at least as he frames the matter and perceives UTOPIA's interests and vulnerabilities, go [sic] by the names of 'blackmail' and 'extortion.'" App. 316.

Hogan's attorney's response further detailed "the already precarious public opinion of UTOPIA" and the likelihood that this "lawsuit will destroy any faith that the public has in UTOPIA," thereby preventing it from receiving needed public bonds. App. 332.

Shortly thereafter, each party filed a lawsuit. UTOPIA filed a request in state court for a preliminary injunction to prevent Hogan from disclosing

information he had learned during his employment.  At UTOPIA's urging, the state court sealed the case record.  Hogan then filed suit in federal court.  The Salt Lake Tribune wrote an article about the suit, and UTOPIA moved to seal the record in the federal case as well.

The state court took action first, denying UTOPIA's request for an injunction after conducting an evidentiary hearing.  It reserved the issue of whether to unseal the record.  The next day, however, UTOPIA voluntarily dismissed the case, its motion to seal the state court record, and its motion to seal the federal court record.

Five days later, on May 1, 2011, local media outlet KSL published an online article entitled "Former UTOPIA contractor accused of extortion."  In full, the article read,

> Chris Hogan, a Colorado man retained by UTOPIA as a contractor to provide consulting services, is being accused of extortion in court documents that were unsealed in Utah's 3rd District Court on Wednesday.  Utah Telecommunications Open Infrastructure Agency, or UTOPIA, is a fiber optic deployer run by a consortium of 16 Utah cities to provide high-speed broadband to their communities, and Hogan provided marketing consulting for the past three years.
>
> Hogan's contract was not renewed last month by UTOPIA due to "performance issues," according to UTOPIA board chairman and Midvale City Manager Kane Loader.  On March 21 and 24, days after being informed that the contract was not going to be renewed, Hogan's attorney, Steve S. Christensen, sent written notices to UTOPIA threatening to file a lawsuit and

noting that Hogan would bring unfavorable public scrutiny to UTOPIA unless specific demands of Hogan's were met. Such publicity, according to Christensen, would "threaten to destroy the work of UTOPIA."

Hogan's financial demands totaled $219,000, including punitive damages and legal fees; but he also made the unusual request of demanding that UTOPIA executive director Todd Marriott be terminated, that Hogan be allowed to participate in the search and training of a new executive director, and that Hogan be free to establish his own succession plan for a "smooth transition" with the organization. "This offer will remain open until April 4, 2011," concluded Christensen.

"What Mr. Hogan attempts in proposing this extravagant course go by the names of 'blackmail' and 'extortion,'" replied UTOPIA attorney David Shaw in an April 4 reply, unsealed Wednesday. UTOPIA also responded by filing a suit against Hogan in Utah's 3rd District Court to ensure that he would abide by the confidentiality clause of his contract. Hogan responded Tuesday by filing a lawsuit in U.S. District Court in Utah. This suit accuses Marriott of favoring a neighbor for a potential employment position, favoring a company that employed Marriott's brother for a bid, and other complaints of mismanagement.

"Any allegations of impropriety by UTOPIA and its management in this suit are without merit, and we stand by UTOPIA CEO Todd Marriott and his team," responded Loader in a statement from UTOPIA's board Wednesday. "The management team at UTOPIA is sound and continues to grow and operate our award-winning fiber optic network," he said.

"It is a very sad situation," noted one UTOPIA vendor. "Chris Hogan was a great talent, but in recent months exhibited erratic behavior that ultimately brought him down."

The lawsuit was filed weeks, or perhaps a couple months, before UTOPIA is expected to receive a $20 million round of financing later this spring.

App. 132.

The article's byline named freelance writer "Richard Burwash."  More than

six months after the article's publication, however, Winder disclosed to KSL's

parent corporation that he had written this article and several others under that

pseudonym.

The KSL article cites the case record as one of its sources, which the article

indicates was unsealed on April 27.  Hogan claims, however, that, despite

UTOPIA's withdrawal on that day of its motion to seal the records, the records

remained inaccessible to the public until May 5.

On May 2, fiber optics industry publication FierceTelecom published a

paraphrased and condensed version of the KSL article, authored by defendant

Sean Buckley.  Other media outlets republished and excerpted the KSL and

FierceTelecom articles.

According to Hogan, the articles have prevented him from finding

employment in the telecommunications industry and have also caused him

physical and emotional distress.

## II.  Analysis

Hogan argues that the district court erred in dismissing his case.  At this

stage in the litigation, we accept as true the well pleaded factual allegations and

then determine if the plaintiff has provided "enough facts to state a claim to relief

that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547

(2007).  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see

also Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir.  2011)

(discussing the nature and specificity of allegations that satisfy the plausibility

standard).  Our review is de novo.  *See Atlantic Richfield Co. v. Farm Credit

Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000).[3]

The district court dismissed six separate causes of action.  We discuss each

in turn.

### A.  *Defamation and Defamation by Implication*[4]

Hogan first contends the district court erred in dismissing his defamation

and defamation by implication claims.

The torts of defamation and defamation by implication are more or less

different sides of the same coin.  To establish defamation under Utah law, a

plaintiff must prove four elements: (1) that the defendants "published the

---

[3]  The defendants argue that Utah applies a higher standard of review for
defamation claims.  In defamation cases,"the First Amendment's presence merits
altering our customary rules of review by denying a nonmoving party the benefit
of a favorable interpretation of factual inferences."  *Jacob v. Bezzant*, 212 P.3d
535, 543 (Utah 2009).  We need not decide whether to apply the state law
standard of review because the defendants prevail under either standard.

[4]  Defendants contend we should not consider Hogan's direct defamation
claim because, on appeal, he has argued only a defamation by implication claim.
But his brief can be fairly read to encompass a claim that statements about his job
performance and behavior are directly defamatory.

statements"; (2) that the "statements were false, defamatory, and not subject to any privilege"; (3) "that the statements were published with the requisite degree of fault"; and (4) that "their publication resulted in damage" to the plaintiff.[5] *West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994) (citations omitted).  Truth ordinarily is a complete defense against a direct defamation suit. *See Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 57 (Utah 1991) ("In this state, truth is an absolute defense to an action for defamation."); *see also Gomba v. McLaughlin*, 504 P.2d 337, 339 (Colo. 1972) ("A defendant asserting truth as a defense in a libel action is not required to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting, of the matter is true.").

    But even if a statement is not directly defamatory because it is true, it can be defamatory by implication.  *West*, 872 P.2d at 1011.  In a defamation by implication action, "it is the implication arising from the statement and the

_____

    [5]  Because Hogan fails to satisfactorily plead that the articles were false and defamatory, we need not reach the question of whether he successfully pleaded the other required elements of a defamation claim, including fault and whether the articles discuss matters of public concern.  The Supreme Court has determined that "speech on matters of public concern [] is at the heart of the First Amendment's protection" and therefore the plaintiff must plead malice rather than negligence. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-59 (1985).  But there is some disagreement about what a defamation plaintiff must do to plead that the defendants acted with malice.  *See* J.H. Cooper, Sufficiency of Plaintiff's Allegations in Defamation Action as to Defendant's Malice, 76 A.L.R.2d 696 (1961) (listing jurisdictions in which a general allegation of malice is sufficient and other jurisdictions in which the plaintiff must plead specific facts supporting that allegation).

context in which it was made, not the statement itself, which forms the basis of

[the] claim." *West*, 872 P.2d at 1011. As the Utah Supreme Court explained,

> Words that appear at first blush to convey a defamatory
> meaning may be explained away as innocuous when
> their context is made clear. Conversely, words innocent
> on their face may, when explained in context, convey a
> defamatory meaning.

*Id.* at 1011 n.18 (citations omitted) (quoting Rodney A. Smolla, *Law of*

*Defamation* § 4.05[1] at 4-18 (2d ed. 1999)). The court offered this example of

defamation by implication:

> The classic example is the statement that John Smith
> was seen walking into a hotel room with Mary. On its
> face, the statement does not communicate anything
> intending to injure reputation. If, however, there is
> added to the statement the fact that John Smith is
> married to someone other than Mary, the inference that
> the ordinary reasonable recipient may draw—that John
> is involved in an adulterous relationship with
> Mary—becomes defamatory.

*Id.* Thus, to prevail in a defamation by implication action, the plaintiff must show

that the gist of the defendant's statement, rather than its literal meaning is "false,

defamatory, and not subject to any privilege." *Id.* at 1007.

What is defamatory? A statement can sustain a defamatory meaning if it

"impeaches an individual's honesty, integrity, virtue, or reputation and thereby

exposes the individual to public hatred, contempt, or ridicule." *Id.* at 1008. In

the common law, defamatory categories included statements imputing to the

plaintiff (1) "a serious crime involving moral turpitude or a felony"; (2) a

character trait showing unfitness for one's "business, trade, or profession"; (3)

acts or views contrary to a "deeply held moral standard of the community"; and

(4) physical or other traits that would cause others to shun the plaintiff.  Dan B.

Dobbs, Paul T. Hayden and Ellen M. Bublick, *The Law of Torts* § 525 (2d ed.

2014).

     But defamatory meaning is a matter of context.  "[A] reviewing court can,

and must, conduct a context-driven assessment of the alleged defamatory

statement and reach an independent conclusion about the statement's

susceptibility to a defamatory interpretation."  *O'Connor v. Burningham*, 165

P.3d 1214, 1222 (Utah 2007).  If the context makes clear a reasonable reader

would not accept the statements at face value, the statements do not cause damage

to the plaintiff's reputation and are therefore not defamatory.  *See Mast v.

Overson*, 971 P.2d 928, 933 (Utah Ct. App. 1998).  On the other hand, a publisher

may be liable "when it takes words out of context and uses them to convey a false

representation of fact."  *Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir.

1977) (citing *Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 13 (1970) ("If

the reports had been truncated or distorted in such a way as to extract the word

'blackmail' from the context in which it was used at the public meetings, this

would be a different case.")).

     In this evaluation of context, we should examine (1) the words themselves

and their implications; (2) the entire article or message; (3) the events or disputes

that gave rise to the article; and (4) the likely effect on the reasonable reader. *See* Dobbs at § 526. "Trying to focus on the defamatory words alone wold be like trying to appreciate a pointillist painting by Seurat with a magnifying glass—the telling pattern would be lost in a maze of dots." *Id.*

Finally, it is especially important that "[w]hether a statement is capable of sustaining a defamatory meaning is a question of law." *West*, 872 P.2d at 1008. And "[o]nly if a court first determines that a publication might be considered defamatory by a reasonable person is there a fact issue for the trier of fact." *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988). When the "underlying facts as to the gist or sting are undisputed, substantial truth may be determined as a matter of law." *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, No. 11-1042, 2014 WL 3307834, at *7 (10th Cir. July 9, 2014) (internal quotation marks omitted) (citing *Lundell Mfg. Co. v. Am. Broad. Cos.*, 98 F.3d 351, 360 (8th Cir. 1996)).

With this legal framework in mind, we consider the two challenged articles. For analytical convenience, we have identified two categories of allegedly defamatory statements in the KSL and FierceTelecom articles: statements about Hogan's job performance and statements characterizing Hogan's actions as extortion and blackmail. We examine and reject each in turn.

### 1. *"Performance Issues"*

Both the KSL and FierceTelecom articles reported UTOPIA's spokesman's statement that Hogan's contract was not renewed for "performance issues." In the KSL article, Winder reported: "Hogan's contract was not renewed last month by UTOPIA due to 'performance issues,' according to UTOPIA board chairman and Midvale City Manager Kane Loader." App. 132. The FierceTelecom article included a shortened version of that same statement: "UTOPIA decided not to renew Hogan's contract due to 'performance issues.'" App. 135. Additionally, the KSL article went on to report a quote from another source: "'It is a very sad situation,' noted one UTOPIA vendor. 'Chris Hogan was a great talent, but in recent months exhibited erratic behavior that ultimately brought him down.'" App. 132.

In context, the statements about Hogan's job performance are not defamatory. First, the vague reference to "performance issues" was raised in a story about the ongoing conflict between UTOPIA and Hogan that led to his termination and the filing of a lawsuit. UTOPIA attributes its decision to terminate Hogan to dissatisfaction with his job performance, while Hogan argues that the real reason he was fired was because he blew the whistle on favoritism and corruption. But, even if UTOPIA had been hiding its true motives, no reasonable reader would take the statement that Hogan was fired for "performance issues" at face value because the context makes clear that the reason for Hogan's

termination is the subject of an ongoing, obviously nasty, employment dispute. And the characterization, moreover, is simply too nonspecific to sustain a defamatory meaning. *See, e.g., Einhorn v. LaChance*, 823 S.W.2d 405, 411 (Tex. Ct. App. 1992) (holding that saying an employee was fired for reasons relating "solely to work performance" was too nonspecific to be defamatory); *see also Burch v. Coca-Cola Co.*, 119 F.3d 305, 325 (5th Cir. 1997) (citing *Einhorn* for this proposition); *Westfall v. GTE N. Inc.*, 956 F. Supp. 707, 713 (N.D. Tex. 1996) (same); *cf. DeAngelis v. Hill*, 847 A.2d 1261, 1269 (N.J. 2004) ("Only if the statement suggested specific factual assertions that could be proven true or false could the statement qualify as actionable defamation." (internal quotation marks omitted)).

We reach the same conclusion about the descriptions of "erratic behavior" in the KSL article. It is obvious from the context of the articles that UTOPIA is defending its decision to terminate Hogan because of his job performance; the vague and subjective references are part of the back-and-forth of a contentious dispute that no reasonable reader would take at face value.

Because the challenged statements would not convey a defamatory meaning to a reasonable reader, we agree with the district court that the articles' statements about Hogan's job performance are not defamatory as a matter of law.[6]

---

[6] The defendants contend that the fair report privilege protects the articles' statements about Hogan's job performance. *See* Utah Code § 45-2-3(4). But,

(continued...)

### 2. *"Extortion and blackmail"*

Hogan also argues he was defamed by three statements suggesting his actions amounted to extortion and blackmail. In particular, he argues the articles' reports that he was "accused of extortion" falsely suggest that he was accused of a crime and are therefore either directly defamatory or defamatory by implication.

False accusations of criminal conduct can be defamatory, of course, and the crime of extortion is on the books in most jurisdictions. For instance, Utah's criminal code defines extortion as obtaining or exercising control over the property of another by making one of a list of specified threats, including threatening to "reveal any information sought to be concealed by the person threatened." Utah Code. Ann. § 76-6-406.

But accusations of extortion are a familiar rhetorical device. We all know of colloquial or hyperbolic uses of the term. Although the term has a derogatory meaning when used either way, we cannot assume that the term always refers to a crime or similarly heinous conduct. Like with other words, context matters.

In this case, no reasonable reader would interpret the articles' statement that Hogan was accused of extortion to mean that Hogan was being accused of a crime or even especially sharp behavior. Both articles accurately report that the

---

[6](...continued)
because we have concluded that these statements cannot sustain defamatory meanings, we need not reach the issue of whether the statements are subject to the fair report privilege.

accusation was made by UTOPIA's lawyer in a letter discussing the parties' employment dispute. In the letter, UTOPIA objected to Hogan's plans to go public with his allegations of favoritism, and that strategy "at least as he frames the matter and perceives UTOPIA's interests and vulnerabilities, go[es] by the names of 'blackmail' and 'extortion.'" App. 316. No objective reader would believe, after reading the word "extortion" in context, that Hogan had committed a crime. Instead, the reasonable reader would realize not only that the accusation was made in the heat of a nasty employment dispute but also that the objectionable terms were merely hyperbole and rhetorical flourish. "[E]ven the most careless reader must have perceived that the word [extortion] was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the plaintiff's] negotiating position extremely unreasonable." *Greenbelt*, 398 U.S. at 14 (discussing a similar use of the word "blackmail").

Hogan also argues the FierceTelecom article's headline, "UTOPIA contractor faces extortion charges," can be read to report that Hogan has been accused of committing a crime. Hogan further claims that, even if the body of the article clears up the matter, the headline is still defamatory.

The Utah courts have not addressed whether a headline alone can be considered defamatory. The majority of jurisdictions hold that a headline cannot be severed from the body of the article when undertaking defamation analysis; the entire body of the article serves as the context for the headline and must be

-17-

considered in determining whether a headline has a defamatory meaning. *See Salzano v. N. Jersey Media Grp.*, 993 A.2d 778, 793 (N.J. 2010)) ("[T]he headline is not to be considered in a vacuum but must be viewed on the backdrop of the entire report. . . . Indeed, we presume that the public reads the entire article when we assess its fairness and accuracy." (citing *Molin v. Trentonian*, 687 A.2d 1022, 1023–24 (N.J. Super. Ct. App. Div. 1997) ("[T]he majority of jurisdictions support the rule that headlines are to be construed in conjunction with their accompanying articles.")); *see also* Donald M. Zupanec, Libel by Newspaper Headlines, 95 A.L.R.3d 660 (1979) ("[I]t generally has been held that a headline must be construed together with the article to which it refers. In following this rule of construction, it has at times been held that defamatory language in a headline was cured by language in the body of the accompanying article."). Because, as we have described, the body of the article defuses any defamatory meaning the headline might have alone, Hogan cannot prevail under the majority rule.

But Hogan asks us to instead apply the rule set forth in § 563 of the Restatement of Torts. Under this rule, "the text of a newspaper article is ordinarily not the context of the headline . . . because the public frequently reads only the headlines of a newspaper or reads the article itself so hastily or imperfectly as not to realize its full significance." Restatement (Second) of Torts § 563 cmt. d (1977); *see also Las Vegas Sun, Inc. v. Franklin*, 329 P.2d 867, 870

(Nev. 1958) ("The text of a newspaper article is not ordinarily the context of its headline, since the public frequently reads only the headline."); *see also Burgess v. Reformer Publ'g Corp.*, 508 A.2d 1359, 1363 (Vt. 1986) ("[W]e cannot subscribe to the theory that a newspaper is entitled to a summary judgment where it prints a nonlibelous article under a libelous headline." (internal quotation marks omitted)).  The reasoning underlying this approach is that, because we expect much of a newspaper's readership to see only the headline, a newspaper cannot rely on the body of the article to clear up any defamatory misapprehensions.

But we disagree that the headline should always be disassociated from the context of the entire article.  We start with the fundamental principle requiring that a statement be read in context.  The Restatement does not challenge this principle; it indicates simply that "the text of a newspaper article is ordinarily not the context of the headline."  Restatement (Second) of Torts § 563 cmt. d (1977).  But in this case, no reasonable reader would assume that the headline told the whole story and take it at face value.  The reader instead would realize that the publisher was advertising a full article on a dispute and the body of the article would provide context for the headline.  As one commentator put it, "[a] headline cannot, of course, set forth all the details of an article or capture completely its tone.  It is not actionable for doing what it is supposed to: interest the reader in perusing the article proper.  That it 'teases' the reader into reading further is not blameworthy, so long as the headline is not misleading."  Robert D. Sack, Sack

on Defamation § 2:4.6 (2013).  What is more, in this case the headline's context was readily accessible.  With one mouse click, any reader could access the full story and would readily realize the nature of the accusation.

In rejecting Hogan's contention that the headline in this case should be read in isolation, we do not imply that a headline standing alone can never give rise to a defamation action.  This would be a different case if the headline had been disloyal to the context of the article.[7]  But Hogan does not contend that the headline is altogether out of step with the article; his objection to the headline is that it is ambiguous.  The FierceTelecom headline could possibly mean that Hogan was being prosecuted for the crime of extortion or that a lay person had accused him of attempting to intimidate UTOPIA.[8]  One meaning is false, and one meaning is true.  Reasonable readers would identify this ambiguity and, before

---

[7]  *See, e.g., Sprouse v. Clay Commc'n, Inc.*, 158 W. Va. 427, 441 (1975) ("Generally where the headline is of normal size and does not lead to a conclusion totally unsupported in the body of the story, both headlines and story should be considered together for their total impression.  However, where oversized headlines are published which reasonably lead the average reader to an entirely different conclusion than the facts recited in the body of the story, and where the plaintiff can demonstrate that it was the intent of the publisher to use such misleading headlines to create a false impression on the normal reader, the headlines may be considered separately with regard to whether a known falsehood was published.").

[8]  As we have discussed, "extortion" can be used colloquially or to refer to a crime.  Similarly, "charged" can mean a person has been informally called to account for any sort of wrongdoing, or it can mean he was formally charged with a crime.  Webster's Third New International Dictionary 307 (2002).

assuming they knew what had happened, would proceed to the text of the article for clarification.

But, even if we were to apply strictly the Restatement's instruction that a headline should stand alone, Hogan would not prevail here because he is not named in the headline. A curious reader would have to explore the body of the article to learn who had been accused of extortion, and, in doing so, would learn about the employment dispute and the nature of the accusation. *See Crall v. Gannett Satellite Info. Network, Inc.*, 1992 WL 400713 at *3 (S.D. Ohio Nov. 6, 1992) ("Where the plaintiff's name was not contained in the headline, the article and the headline must be construed together as one document to determine whether the newspaper article was libelous to the plaintiff." (quoting *Ledger–Enquirer Co. v. Brown*, 105 S.E.2d 229, 230 (Ga. 1958)).

But wait, Hogan says, he is named in the first paragraph of the article, so a busy reader would quickly find out he was the UTOPIA contractor facing extortion charges. He thus encourages us to read in isolation the headline and the article's first sentence because FierceTelecom published that excerpt of the article on its homepage. He essentially argues this court should read a headline and any excerpt or teaser that a publisher features on a homepage in isolation, as if they constituted a standalone article. But reasonable readers would recognize that the short excerpt of the news article here does not tell the full story; and, if readers want the full story, they will scroll through the rest of the article.

-21-

Finally, Hogan complains of the articles' descriptions of the behaviors that gave rise to UTOPIA's extortion accusation. For instance, KSL reported that Hogan's attorney "sent written notices to UTOPIA threatening to file a lawsuit and noting that Hogan would bring unfavorable public scrutiny to UTOPIA unless specific demands of Hogan's were met." App. 132. Hogan contends this misrepresents the intent of the letters. But the letters themselves refute this position; the articles' characterizations of those letters are substantially true.[9]

Because none of the statements in the articles are defamatory or defamatory by implication, the district court correctly dismissed those claims.

### B. *False Light Invasion of Privacy*

Hogan also contends the articles invaded his privacy and cast him in false light.

In Utah, the tort of false light invasion of privacy requires the plaintiff to show four elements: 1) "giving publicity to a matter concerning another"; 2) "that places the other before the public in a false light"; 3) the false light would be "highly offensive to a reasonable person" and 4) the defendant "has knowledge of

---

[9] We may consider the contents of the letters because, "notwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Brown v. Montoya*, 662 F.3d 1152, 1166 (10th Cir. 2011). The correspondence between Hogan's and UTOPIA's attorneys was referenced in the complaint, and neither party disputes its authenticity.

or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Russell v. Thomson Newspapers*, 842 P.2d 896, 907 (Utah 1992) (adopting the elements set forth in section 652E of Restatement (Second) of Torts). Like defamation claims, claims of "false light invasion of privacy provide legal redress for uninvited notoriety grounded in falsehoods caused by the defendant." *Jensen v. Sawyers*, 130 P.3d 325, 335 (Utah 2005).

This district court dismissed Hogan's false light claim, concluding that, if a statement is not defamatory, it does not cast the plaintiff in a false light. While true to a large extent, Utah's false light law does not apply only to defamatory statements. The tort of "false light invasion of privacy protects a different interest than defamation[.] . . . An actionable portrayal of a person in a false light may or may not include the communication of defamatory information about the victim." *Id.* 334; *see also Russell*, 842 P.2d at 906 ("The invasion of privacy claim protects an individual's interest in being let alone. This interest is distinct from the interest in reputation."); *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 787 (Ariz. 1989) ("[A]lthough defamation and false light often overlap, they serve very different objectives. The two tort actions deter different conduct and redress different wrongs. A plaintiff may bring a false light invasion of privacy action even though the publication is not defamatory.").

Thus, the Utah Supreme Court has recognized the "possibility that a false light invasion of privacy claim may turn on operative facts that do not include defamation." *Jensen*, 130 P.3d at 336.  The court's example of a non-defamatory statement that would still give rise to a false light claim was "dissemination of praiseworthy but untrue information about that person, if a reasonable person would find the information highly objectionable." *Id.* at 334.  Although not defamatory because it does not impeach an individual's reputation, a statement could still cast a person in a false and objectionable light.

Hogan contends his claim can go forward even though we have concluded the articles were not defamatory.  But even as the KSL and FierceTelecom articles cannot give rise to a defamation claim, they do not place Hogan in a false light when read in context because none of the statements can be construed as false.  The articles accurately report the statements or documents as part of an ongoing employment dispute, or as we discussed above, are simply too vague and nonspecific to sustain a false impression that would be highly objectionable to a reasonable person.

### C.  *Intentional Infliction of Emotional Distress*

Next, Hogan claims the district court erred in dismissing his claim that publication of the articles constitutes an intentional infliction of emotional distress.

To state a claim for intentional infliction of emotional distress under Utah law, the plaintiff must plead that the defendant "intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; and his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality." *Cabaness v. Thomas*, 232 P.3d 486, 499 (Utah 2010). Further, "where a private figure plaintiff brings suit against a media defendant, alleged defamatory words do not give rise to a cause of action for emotional distress absent a showing of negligence as to the falsity of the statement published." *Russell*, 842 P.2d at 906.

Hogan relies on the same statements we have already explored in his defamation and false light claims. For the same reasons we have already discussed, the statements do not meet the high standards of Utah law requiring outrageousness. In addition, Hogan failed to plead sufficient facts making it plausible that the defendants were negligent as to the falsity of the published statements.

Therefore, we agree with the district court that Hogan failed to state a claim for intentional infliction of emotional distress.

### D. Constitutional Claims

Hogan also argues the district court erred in dismissing his two federal civil rights claims against various defendants. He claims that Winder, various UTOPIA employees, and UTOPIA's legal counsel violated his constitutional right to privacy and his right to pursue gainful employment.

Under 28 U.S.C. § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States." *West v. Atkins*, 487 U.S. 42, 48 (1988). Our cases recognize that the Constitution or federal law protects certain rights to privacy and to continued public employment. *See Nilson v. Layton City*, 45 F.3d 369, 371 (10th Cir. 1995) ("The Due Process Clause of the Fourteenth Amendment protects individuals from state intrusion on fundamental aspects of personal privacy"); *Hesse v. Town of Jackson*, 541 F.3d 1240, 1245 (10th Cir. 2008) ("It is well-established constructive discharge from employment is actionable under § 1983 if an employee possesses a protectable property or liberty interest in his employment.").

But to succeed on a § 1983 claim, the plaintiff must also "show that the alleged deprivation was committed by a person acting under color of state law." *West*, 487 U.S. at 48. "The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). "The traditional definition of acting under

color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 49 (internal quotation marks omitted). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Id.* at 50; *see also E.F.W. v. St. Stephen's Indian High Sch.*, 264 F.3d 1297, 1305 (10th Cir. 2001).

The district court concluded Hogan had failed to show that the defendants were acting under the color of state law when they aided in publishing the articles. We agree.

As to the mayor, Hogan's claims fail because the complaint does not sufficiently allege the drafting or publication of the article was made possible because of Winder's authority under state law. Although Winder might have been furthering what he thought were the City's interests, he was not writing the article as part of his mayoral duties. While writing the article, Winder actively concealed both his identity and his relationship with the City. In fact, no one found out who actually wrote the article or even that the author held political office until more than six months after the article's publication. As a result, Winder expressly declined to exercise his power as mayor to represent the City,

and, accordingly, Hogan has failed to show that Winder wrote or published the article while exercising his power pursuant to state law.[10]

Hogan also argues that Winder's allegedly tortious behavior gives rise to municipal liability.  But the municipal liability claim against West Valley City must be based on an official municipality policy that caused the plaintiff's injury. *See Dodds v. Richardson*, 614 F.3d 1185, 1202 (10th Cir. 2010) (holding the law "requires a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal policy custom that caused the plaintiff's injury.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." (citations and internal quotation marks removed)).  The City cannot be liable merely for employing the tortfeasor. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

Hogan cannot satisfy that standard—even if he could show Winder had committed a tort—because he does not adequately plead in his complaint that Winder was executing a West Valley City policy when he wrote the KSL article. The mere fact that the City allows the mayor to represent it in external relationships does not suffice.  Nothing in the record suggests any City policy

---

[10]  Hogan also sued Winder in his official capacity.  We treat Hogan's claims against Winder in his official capacity as claims against Winder's employer, West Valley City. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

authorizing the moonlight journalism of the mayor's pseudonymous "Richard Burwash."

Nor has Hogan adequately alleged that the UTOPIA employees and contractors acted under color of state law.  Hogan contends that someone involved in the litigation must have provided Winder a copy of Hogan's complaint since the court records were not publicly available until after Winder published the article.  But the only documents from the court record Winder explicitly mentions are Hogan's post-termination letter to UTOPIA and UTOPIA's counsel's response characterizing Hogan's behavior as extortion.  As a UTOPIA stakeholder, Winder had access to information about Hogan's performance and the dispute over his termination from numerous sources, including, at the outset, Hogan himself.  Thus, the complaint does not sufficiently suggest that a UTOPIA employee must have provided sealed court documents to Winder to aid him in drafting the KSL article.  Accordingly, Hogan's pleading inadequately alleges the UTOPIA defendants were involved in writing or publishing the KSL article or that, during their involvement, they were acting under the color of state law.

The district court therefore did not err in dismissing Hogan's civil rights claims against all of the defendants.

### E. *Conspiracy*

Finally, Hogan contends the district court erred in dismissing his conspiracy claim.  He claims that, in retaliation for his choice to file a federal lawsuit, the UTOPIA defendants conspired to discredit him through the KSL article and the ensuing negative publicity.

To establish a conspiracy claim under 42 U.S.C. § 1985(2), a plaintiff must prove three elements: (1) a conspiracy, (2) to deter attendance in court or testimony by force or intimidation or to injure a witness for having appeared in court or testified, and (3) injury to the plaintiff.  42 U.S.C. § 1985(2); *see also Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1126 (10th Cir. 1994).   For the conspiracy element, "the sequence of events alleged [must be] sufficient to allow a jury to infer from the circumstances that the conspirators had a meeting of the minds." *Brever*, 40 F.3d at 1127 (internal quotation marks omitted).  "While more than mere conclusory allegations are required to state a valid claim, the nature of conspiracies often makes it impossible to provide details at the pleading stage and . . . the pleader should be allowed to resort to the discovery process and not be subject to dismissal of his complaint." *Id.* at 1126.  Nonetheless, a claim fails when the complaint does not allege either that the defendant's actions in some way were designed to intimidate or deter the plaintiff from appearing in a judicial proceeding, *see Glass v. Pfeffer*, 849 F.2d 1261, 1265 (10th Cir. 1988), or

to injure a person for appearing in court. *See Haddle v. Garrison*, 525 U.S. 121, 125 (1998).

The district court concluded that Hogan failed to establish the conspiracy element because the defendants had no meeting of the minds to harm Hogan in the ways prohibited by § 1985. Hogan challenges that conclusion, arguing he pleaded sufficient facts plausibly establishing that element. For instance, Hogan points to four facts he alleges suggest a meeting of the minds: 1) Winder revealed that UTOPIA's executive director asked Winder to collect Hogan's UTOPIA cell phone; 2) later, the cell phone number he gave to Winder and asked Winder not to disclose was later used by UTOPIA's executive director; 3) after commencing litigation to prevent Hogan from disclosing information, UTOPIA's counsel "reversed its legal strategy" and sought to publicize the dispute, Aplt. Br. at 56; 4) Winder's KSL article mentions documents that, because they had not yet been released to the public, must have been leaked to him by a UTOPIA employee.

These allegations do not satisfy § 1985. Even if the facts imply that UTOPIA and Winder had reached some sort of agreement about managing Hogan's termination, they do not suggest the defendants agreed specifically to deter Hogan's attendance in court or to injure him as a result of his attendance in court. In fact, nowhere does the complaint allege such intent. Hogan's complaint instead focuses on the defendants' intent to defame and discredit him because they feared that he would publicly denounce UTOPIA's nepotism. Similarly, the

facts on which Hogan relies merely suggest that UTOPIA sought to obtain a public relations advantage.  We cannot infer that, if the defendants agreed to discredit the nepotism allegation Hogan had threatened to make in the press, they necessarily agreed to deter Hogan's wrongful termination lawsuit or injure him as a result of it.

### III.  Conclusion

Because Hogan has failed to state a claim upon which relief can be granted, we AFFIRM the decision of the district court.